*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
March 14, 2024

v

No. 354157
Washtenaw Circuit Court
LC No. 18-000693-FC

GARY ALAN COUNTRYMAN,

        Defendant-Appellant.

Before: SWARTZLE, P.J., and REDFORD and YATES, JJ.

PER CURIAM.

As a result of a protracted, methamphetamine-fueled dispute between defendant, Gary Alan Countryman, and Shayne Teall, defendant was charged with, and ultimately convicted of, assault with intent to commit great bodily harm less than murder (AWIGBH), MCL 750.84(1)(a), assault with a dangerous weapon (felonious assault), MCL 750.82, carrying a concealed weapon (CCW), MCL 750.227, and carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b.[1] Defendant was sentenced, as a fourth-offense habitual offender, MCL 769.12, to serve concurrent prison terms of 9 to 30 years for AWIGBH, 3 to 15 years for felonious assault, 4 to 20 years for CCW, and a consecutive two-year prison term for felony-firearm. We affirm.

## I. FACTUAL BACKGROUND

On July 25, 2018, defendant picked up Teall and his fiancé, Nicole Conaway, in his white Mercedes-Benz and drove them both to Ypsilanti. Later, defendant drove Teall and Conaway from

---

[1] Defendant was also charged and tried for unarmed robbery, MCL 750.530, in a separate case that arose from the same set of facts, but he was acquitted of unarmed robbery. Additionally, as noted in the judgment of sentence, defendant was charged with one count of kidnapping, MCL 750.349, and two counts of unlawful imprisonment, MCL 750.349b, but those charges were dismissed when the district court declined to bind over defendant on those charges after a preliminary examination. As a result, those charges are not at issue in this appeal and will be discussed only when necessary for a better understanding of the facts underlying the counts of conviction.

Ypsilanti to defendant's house in Pittsfield Township, where defendant made breakfast for Teall and Conaway. After breakfast, Teall and defendant had a disagreement over jewelry that defendant believed Teall had stolen. Defendant took the jewelry from Teall and moved it to another room. When defendant returned, Teall and defendant injected methamphetamine and got high.

After defendant and Teall injected methamphetamine on July 26, 2018, the two men and Conaway walked into the kitchen, where defendant and Teall continued arguing about the jewelry. Defendant wanted Teall to clean defendant's car, but Teall did not go to the car. Instead, he stayed in the house. The argument turned into a physical altercation when defendant pushed Teall down and held Teall on the floor. The confrontation moved into the hallway, where defendant's dog bit Teall's arm and drew blood. Shortly after that, defendant's wife, Nicole Countryman (who was a registered nurse), came home and bandaged Teall's arm to address the wound.

Defendant's wife told defendant that Teall and Conaway had to leave, so defendant led the two of them to his white Mercedes-Benz, where Conaway sat in the back seat and defendant made Teall sit in the front passenger's seat while defendant drove away from his house. Soon after they left the house, however, the car ran out of gas. Defendant called his wife, who arrived quickly in a blue Mercedes-Benz to pick up defendant, Teall, and Conaway. As the four of them drove away, defendant's wife was driving the car, defendant was sitting in the front passenger's seat, and Teall and Conaway were sitting in the back seat.

Defendant's wife drove the four of them to a nearby bank to get money. When they pulled up to the ATM, Teall tried to get out of the car, but defendant grabbed Teall, pulled him back into the car, pointed a gun at Teall's head, and threatened to shoot Teall. Teall responded: "Then kill me." Instead of shooting Teall, defendant began hitting Teall in the head with the gun. According to Teall, defendant hit him with the gun 16 times in the back of the head and six times in the face. While that was happening, defendant's wife jumped out of the car and ran away and Conaway was hit by the gun that defendant was swinging at Teall. Conaway opened one of the back doors and pushed Teall out of the car. Teall ran away, leaving only defendant and Conaway in the car, which had blood spatters on the interior. Teall suffered significant wounds to his head that required nine staples to close.

Defendant drove away from the bank at high speed with Conaway sitting in the back seat. While he was driving, defendant called his son and acknowledged that he "messed up" and he was "going to get in trouble for this." Defendant threw the gun out of the car and then called his wife, who was very upset and told defendant to "turn around and come back" because the police wanted to talk to him. But defendant kept telling her no. Instead, defendant drove to a friend's house and he stayed there with Conaway for one night. The next morning, defendant woke up Conaway and told her that they had to leave right away because "he just got word that the FBI [was] looking for [him]." Defendant gave the keys to his wife's Mercedes-Benz to his friend and the two men talked about having that car detailed. Defendant then left his friend's house in his friend's car. Conaway rode along with defendant when he left. Later that day, the police tracked down defendant in his friend's car, placed defendant under arrest, and eventually released Conaway.

Defendant chose to proceed to a jury trial, which took place over five days in October 2019. At trial, defense counsel focused on the fact that everyone involved in the events had been using methamphetamine, which likely caused a fistfight in the blue Mercedes-Benz. Trial counsel called

defendant's wife as a witness to establish that defendant never used a gun, but the jurors rejected that theory and convicted defendant on all four charges concerning his assault upon Teall.[2] After defendant was sentenced for the offenses of conviction on November 20, 2019, he filed this appeal of right.

On July 31, 2021, while this appeal was pending, defendant moved for a new trial or for a *Ginther* hearing.[3] The trial court granted the request for a *Ginther* hearing, which took place over three days in August and September 2022. Defendant provided testimony from Michelene Sample and Myles Ross, who stated that they spoke to Conaway after the altercation. They both testified that Conaway seemed unafraid of defendant and that Conaway said defendant did not have a gun. Defendant and his wife testified about defense counsel's preparation for trial, which they believed was inadequate. Defendant explained that he wanted to testify at trial, but was convinced by his trial counsel not to do so. Defense counsel testified about the strategic reasons for trying the case as he did. On August 1, 2023, the trial court issued a ten-page opinion denying defendant's motion for a new trial, so the appeal is now before us on a comprehensive record.[4]

## II. LEGAL ANALYSIS

On appeal, defendant has chosen to focus exclusively on his claim of ineffective assistance of counsel. "Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v Spaulding*, 332 Mich App 638, 655-656; 957 NW2d 843 (2020) (quotation marks and citation omitted). "Constitutional questions of law are reviewed de novo, while findings of fact are reviewed for clear error." *Id*. at 656. "When the reviewing court is left with a definite and firm conviction that the trial court made a mistake, there is clear error." *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021) (quotation marks and citation omitted). In contrast, "[d]e novo review means that we review the issues independently, with no required deference to the trial court." *People v Hoskins*, 342 Mich App 194, 200; 993 NW2d 48 (2022) (quotation marks and citation omitted).

To demonstrate ineffective assistance of counsel, "defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). We presume counsel was effective, and defendant must bear a heavy burden to overcome this presumption. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). Significantly, this Court does not second-guess defense counsel "on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Traver (On Remand)*, 328 Mich App 418, 422-423; 937 NW2d 398 (2019) (quotation

---

[2] The jury acquitted defendant on two charges of unarmed robbery that arose out of the same series of events as the four counts of conviction.

[3] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[4] Defendant attempted to appeal of right from the trial court's order denying his posttrial motion and the trial court's subsequent order denying his motion for reconsideration, but this Court issued an order dismissing that appeal "for lack of jurisdiction." *People v Countryman*, unpublished order of the Court of Appeals, entered October 10, 2023 (Docket No. 368023).

marks and citation omitted). In assessing the prejudice that results from deficient performance by defense counsel, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018). With all these stringent standards in mind, we shall consider defendant's claims of ineffective assistance of counsel.

## A. PREJUDICE

An insuperable barrier to relief on defendant's claim of ineffective assistance of counsel is his obligation to establish prejudice resulting from any deficient performance by his trial attorney. The events giving rise to defendant's four convictions involved only the four people who were in the blue Mercedes-Benz when defendant attacked Teall while the car was parked at the ATM. Of those four people, everyone except defendant testified at length during the trial and offered nearly identical accounts of the events. In addition, a videotape of the events was admitted into evidence and played for the jury. Beyond that, the jury saw photographs of Teall's head injuries in the wake of the attack. Based on the wealth of evidence adduced at trial, there can be no doubt that defendant attacked Teall while defendant was in the front passenger's seat and Teall was in the back seat of the Mercedes-Benz. Although defendant's wife testified that she never saw a gun, suggesting that defendant must have used his fists—rather than a gun—to hit Teall, the massive head wounds that Teall suffered bear no resemblance whatsoever to injuries inflicted with a fist. Also, defendant's wife testified that one side of Teall's head was covered in blood after the altercation and Teall had to be taken from the scene in an ambulance.

The jury considered all of that evidence and convicted defendant on assault and firearms charges, reflecting their belief beyond a reasonable doubt that defendant repeatedly beat Teall with a gun. In light of the trial record, we find no "reasonable probability that the outcome would have been different" if defense counsel had performed more effectively. *Trakhtenberg*, 493 Mich at 51. By itself, that conclusion requires us to affirm the trial court's decision that defendant has no right to a new trial based on his claim of ineffective assistance of counsel. Nevertheless, for the sake of completeness, we shall also consider each instance of allegedly deficient performance to determine whether defendant's trial attorney fell short in any respect in his representation of defendant.

## B. DEFICIENT PERFORMANCE

Defendant accuses his trial attorney of myriad professional missteps at trial. We must bear in mind, however, that defendant was not entitled to perfect representation. *People v Pickens*, 446 Mich 298, 314; 521 NW2d 797 (1994). Rather, defendant had the right to constitutionally adequate legal representation, which means representation that did not fall "below an objective standard of reasonableness." *Trakhtenberg*, 493 Mich at 51. Therefore, our assessment of defense counsel's work at trial is limited to a search for representation that falls short of that standard, which we shall apply in addressing defendant's numerous claims of deficient representation.

## 1. EVIDENTIARY ISSUES

Defendant argues that his trial counsel was ineffective for failing to object to the admission of evidence that he believes was inadmissible. First, defendant contends trial counsel should have objected to testimony about the presence of blood in the blue Mercedes-Benz. Defendant claims an objection would have been sustained because the stains in the car were never tested to determine

if they were actually blood. In spite of that, Officer Chris Boulter and Conaway testified there was blood inside the blue Mercedes-Benz. This argument fails because any objection to the testimony would have been overruled. As this Court noted in *People v Zitka*, 335 Mich App 324, 345; 966 NW2d 786 (2020), MRE 701 permits the admission of lay opinions if " 'the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.' " Here, Conaway did not require any scientific confirmation to know that the stains in the car were blood because she was inside the vehicle when the stains were made. Lay witnesses are qualified to testify about the opinions they form as a result of direct physical observation. *People v Hanna*, 223 Mich App 466, 475; 567 NW2d 12 (1997).

Officer Boulter also offered his lay opinion that the stains in the blue Mercedes-Benz were blood. He investigated the crimes and found the vehicle at a house in White Lake where defendant left it with a friend. He opened the car door and looked inside, observing stains he believed were consistent with blood. Officer Boulter did not testify that he had any expert knowledge or that he tested the fluids to ensure they were blood. Instead, he merely stated, based on his observation of the stains, that they appeared to be blood. Such testimony was not impermissible under MRE 701. Officer Boulter appropriately testified about the opinions he formed "as a result of direct physical observation." *Id.* In sum, the testimony of Conaway and Officer Boulter about blood being in the blue Mercedes-Benz was admissible as lay opinions on the basis of direct observation, MRE 701; *Hanna*, 223 Mich App at 475, so an objection by defense counsel to the evidence would have been overruled, and we "will not find trial counsel to be ineffective where an objection would have been futile[.]" *People v Ogilvie*, 341 Mich App 28, 34; 989 NW2d 250 (2022).

Next, defendant contends trial counsel should have objected to Officer Boulter's testimony about blood spatter. Defendant asserts that Officer Boulter was not a blood-spatter expert, so he was not allowed to testify about it. "MRE 702 establishes prerequisites for the admission of expert witness testimony." *People v Kowalski*, 492 Mich 106, 119; 821 NW2d 14 (2012). Experts may not testify under MRE 702 "unless the trial court first determines that 'scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue' and the expert witness is 'qualified as an expert by knowledge, skill, experience, training, or education . . . .' " *People v Yost*, 278 Mich App 341, 393; 749 NW2d 753 (2008). There was only one instance when Officer Boulter used the term "blood spatter," which occurred while he was reviewing photographs of the blue Mercedes-Benz. Officer Boulter testified "actually on the seatbelt it appears to be blood splatter [sic]."

Defendant's argument fails because Officer Boulter's testimony was not an expert opinion. Officer Boulter did not offer testimony about the angle or form of the droplets of blood in the blue Mercedes-Benz. He did not use the shape and pattern of the blood spatters in an attempt to explain how the crimes occurred. In other words, he made no effort to "reconstruct the scene of the crime" on the basis of "the laws of inertia, c[e]ntrifugal force and physics." *People v Haywood*, 209 Mich App 217, 222; 530 NW2d 497 (1995). Instead, Officer Boulter merely identified spots he believed to be blood on the seatbelt in the back seat of the blue Mercedes-Benz. Officer Boulter's opinion that the stains in the car were blood was admissible lay-opinion testimony. Because he did not try to provide any opinion about the construction of the crime scene on the basis of the blood spatter, he did not offer an expert opinion under MRE 702. As a result, any objection by trial counsel on the grounds of impermissible expert testimony would have been overruled, and we "will not find

trial counsel to be ineffective where an objection would have been futile . . . ." *Ogilvie*, 341 Mich App at 34.

Defendant also claims that his counsel should have objected to Officer Boulter's testimony about Conaway being kidnapped, so we must consider whether such an objection would have been sustained. *Id*. Defendant argues that evidence of kidnapping was irrelevant because those charges had been dismissed. Pursuant to MRE 402, "[i]rrelevant evidence is not admissible." Ordinarily, "evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the action more probable or less probable than it would be without the evidence." *People v Smith*, 336 Mich App 79, 113; 969 NW2d 548 (2021). Evidence reflecting "consciousness of guilt is relevant[,]" and evidence of a defendant attempting to avoid arrest allows for an inference of consciousness of guilt. *People v Parrott*, 335 Mich App 648, 680; 968 NW2d 548 (2021). Thus, any objection to Officer Boulter's testimony would have been overruled because Officer Boulter simply said he was investigating a possible kidnapping, not that Conaway actually was kidnapped. When asked how he started his investigation, Officer Boulter explained that "the female and the suspect were missing and were still gone and had presumed to been kidnapped is what I was told in the morning." Later, when asked a similar question, Officer Boulter again stated, "we thought we may even have a possible kidnapping on our hands." Hence, Officer Boulter simply explained why he was trying to find defendant and Conaway.

Officer Boulter's description of his investigation was relevant. The trial record established that defendant knew the police were looking for him, he was told by several people including his wife to turn himself in, yet he refused to do so. Because of defendant's refusal to turn himself in, Officer Boulter had to conduct an investigation to find defendant and Conaway. In the fullness of time, defendant was stopped by the police and arrested as a result of that investigation. Therefore, defendant's knowing avoidance of arrest permitted an inference of consciousness of guilt. *Parrott*, 335 Mich App at 680. Accordingly, any objection to that evidence based on relevance would have been overruled, and we "will not find trial counsel to be ineffective where an objection would have been futile . . . ." *Ogilvie*, 341 Mich App at 34.

Next, defendant asserts trial counsel should have objected to Officer Boulter's description of the house in White Lake where he left the blue Mercedes-Benz with a friend. Defense counsel's lack of an objection to that evidence was characterized as a matter of trial strategy, which is beyond our review in most instances. *Traver*, 328 Mich App at 422. If strategic decisions were reasonable under the circumstances, we cannot substitute our judgment for that of defense counsel. *People v Ackley*, 497 Mich 381, 388-389; 870 NW2d 858 (2015). Defendant contends trial counsel should have objected when Officer Boulter was asked about the White Lake house and answered:

> It was an odd house as far as when we were there the owner of the house, there are several people that don't live there that just stay there.
>
> There was females running around in very little clothing.
>
> There was people who were just had been like sleeping all over couches and just randomly.

The way I describe it to people that I've talked [to], it [was] like a Hollywood kind of thing when they go to the drug person's house and there's strippers everywhere and drugs everywhere that's pretty much kind of what this was house like. It was very odd.

Defendant contends that it was detrimental for him to be connected to a house where people were openly using drugs. In a typical case, that might be true. As trial counsel explained, however, his strategy was to focus the jury's attention on the use of methamphetamine by defendant, Teall, and Conaway. Trial counsel hoped that the jury would believe that defendant and Teall got into a methamphetamine-fueled fistfight, but the fight did not involve a gun. Accordingly, trial counsel did not think defendant's presence at a Hollywood-style party house was detrimental. Instead, it was part of his trial strategy. Importantly, defendant's wife testified that defendant used drugs. In fact, defendant's wife stated that she and defendant were not staying in the same home at the time of the altercation because of defendant's partying behavior and drug use. Therefore, there was no dispute about whether defendant used drugs, nor would it be particularly harmful to the defense if defendant went to a house where people used drugs. Indeed, defendant's use of methamphetamine provided an explanation for why he fought with Teall. As the trial court aptly noted in its findings after the *Ginther* hearing, the factual scenario leading up to the assault would have been confusing without the knowledge that defendant, Teall, and Conaway were using drugs.

Beyond that, the evidence about the White Lake house being a party house had the potential to undermine Conaway's testimony. Conaway stated that she was afraid of defendant and wanted to leave. But evidence about the White Lake house established that the people there were partying. Because the record revealed that Conaway regularly used methamphetamine, it was reasonable to surmise that the jury would decide Conaway was at the party voluntarily to engage in drug use. If the jury did not believe Conaway's denial on that point, the jury would be more likely to disbelieve Conaway's testimony about defendant's fight with Teall and defendant's use of a gun. Therefore, the trial court concluded this was a reasonably strategic decision by trial counsel. Although that strategy was unsuccessful, we will not "assess counsel's competence with the benefit of hindsight." *People v Rosa*, 322 Mich App 726, 742; 913 NW2d 392 (2018) (quotation marks and citation omitted). Instead, it is enough that the trial strategy was reasonable and furthered by the decision to allow Officer Boulter's testimony about the White Lake house. *Id*.

Defendant claims that defense counsel should have objected to Officer Boulter's incorrect testimony about the presence of ammunition in the blue Mercedes-Benz. Counsel testified that he did not object to Officer Boulter's erroneous testimony about ammunition because he thought that it would be better for the defense to have Officer Boulter correct his own error. And, indeed, that is precisely what occurred on cross-examination. In fact, the second day of defendant's trial ended with the jurors hearing Officer Boulter admit he had misspoken during direct examination. Viewed in that light, defense counsel ought not be faulted for choosing not to challenge Officer Boulter's initial claim that a box of ammunition was in the blue Mercedes-Benz. Simply stated, having the jury hear the lead police officer testify that he was mistaken about the presence of ammunition in the blue Mercedes-Benz was more powerful than a contemporaneous objection would have been.

## 2. CALLING WITNESSES

Defendant challenges defense counsel's decision not to call Michelene Sample and Myles Ross to testify at the trial. "Decisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy, and this Court will not substitute its judgment for that of counsel regarding matters of trial strategy." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). But we must see "whether the strategic choices were made after less than complete investigation," because choices are "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Trakhtenberg*, 493 Mich at 52 (quotation marks, citation, and brackets omitted). In that respect, "counsel's strategy must be sound, and the decisions as to it objectively reasonable." *Ackley*, 497 Mich at 389.

Defendant insists Sample would have testified that she spoke to Conaway after the assault in the blue Mercedes-Benz and Conaway told her that defendant did not have a gun. Trial counsel explained he did not call Sample as a witness because her testimony about Conaway's statements would be inadmissible hearsay. Defendant counters that Conaway's statements were admissible under MRE 803(2), the "excited utterance" exception to the hearsay rule, which allows admission of statements "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." For MRE 803(2) to apply, the "statement must meet three criteria: (1) it must arise out of a startling occasion; (2) it must be made before there has been time to contrive and misrepresent; and (3) it must relate to the circumstances of the startling occasion." *People v Straight*, 430 Mich 418, 424; 424 NW2d 257 (1988) (citation omitted).

The trial court concluded that Sample's testimony would be hearsay. On appeal, defendant contends that Sample's testimony would have been beneficial as to whether defendant had a gun. Defendant relies on MRE 803(2) to argue that Sample's testimony about Conaway's statement to Sample would have been admissible. But to avoid a hearsay problem, Conaway must have been "under the sway of excitement precipitated by an external startling event . . . ." *People v Smith*, 456 Mich 543, 550; 581 NW2d 654 (1998) (quotation marks and citation omitted). When Sample was asked how Conaway sounded during their conversation, Sample responded: "[S]he was fine. They were going to go swimming. They were going to get a suit and go swimming. That's what she said. She was fine." Thus, by Sample's own admission, Conaway did not sound like she was stressed or excited from the assault that occurred earlier in the night. Instead, Conaway sounded calm, unconcerned, and ready to go swimming. In other words, Sample provided no indication that Conaway was in the midst of a stressful event when she made statements indicating defendant did not have a gun, so Sample's testimony would have been inadmissible hearsay.

Defendant next insists that his trial attorney should have called Ross as a witness. Defense counsel testified he did not call Ross as a witness because any benefit would have been outweighed by the detrimental impact of Ross, who would have testified he met with defendant and Conaway after defendant's altercation with Teall. Ross stated that Conaway seemed fine, she was not afraid of defendant, she seemed happy to be with him, and she never mentioned the presence of a gun. Conaway even called defendant "Big Daddy." When they were informed that the police might be using the GPS in the blue Mercedes-Benz to find defendant, Conaway voluntarily looked up an instructional video and disabled the GPS.

Ross's testimony would have undercut Conaway's claim of being afraid of defendant and effectively being held against her will, but Ross presented substantial risks. First and foremost, he had a significant criminal history, including crimes related to dishonesty and theft. Specifically, Ross testified he had been convicted of identity theft, home invasion, safe breaking, and possession of burglar's tools. The prosecution would have been permitted to use those convictions on cross-examination. Moreover, at the time Ross met defendant, Ross was on parole and not permitted to associate with known felons. In other words, considering defendant's own criminal history, Ross was violating his conditions of parole by meeting with defendant. Ross admitted he was aware of defendant's past.

Second, trial counsel had a reason not to call Ross as a witness because his credibility was suspect. Before the *Ginther* hearing, Ross stated that he knew how to disable the GPS in the blue Mercedes-Benz and instructed Conaway how to do it. At the *Ginther* hearing, Ross contended he could not have instructed Conaway because Ross did not know how to disable the system. Instead, Ross was certain Conaway looked up the instructional video of her own free will. It is reasonable strategy to avoid calling a witness who is willing to lie either in an affidavit or while under oath at a hearing. Third, defense counsel had a far more credible witness to testify about the same points Ross would have addressed. Defendant's wife testified she was inside the blue Mercedes-Benz when the fight occurred and she did not see defendant with a gun. Further, she testified Conaway had several opportunities to leave the car and escape from defendant, but she repeatedly failed to do so. Unlike Ross, defendant's wife did not have prior convictions and there was no evidence of her history of lying while under oath or her use of any controlled substances. In light of Ross's criminal history, his questionable credibility, and the availability of defendant's wife as a witness, defendant cannot show that his counsel's decision not to call Ross was objectively unreasonable.

Defendant asserts that his attorney should have found and presented an expert witness on the subject of blood spatter. "An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). Defendant relies heavily on his contention that Officer Boulter improperly provided expert testimony regarding blood spatter. But as we have explained, Officer Boulter only identified fluids that he believed to be blood; he did not offer any expert testimony concerning blood spatter. Thus, defense counsel's decision not to call an expert on the subject of blood spatter was reasonable trial strategy. As defendant's attorney explained at the *Ginther* hearing, if he had hired an expert, the prosecution would have been afforded the opportunity to hire their own expert in the area of blood spatter, and the trial would have focused on the blood in the blue Mercedes-Benz. Defense counsel correctly noted that that approach would have disadvantaged the defense because there was no real dispute that a fight took place in the blue Mercedes-Benz, resulting in injuries to Teall. If the jury had heard competing expert witnesses testify about the blood, the jury may very well have thought more thoroughly about how much Teall bled and what that meant with regard to whether defendant used a gun, rather than his fists, to strike Teall. Simply put, defense counsel did not want the jury's focus on the blood in the car. That was a reasonable strategic decision made by defense counsel, and we will not second-guess it on appeal. *Payne*, 285 Mich App at 190.

### 3. ADDRESSING PROSECUTORIAL MISCONDUCT

Defendant faults his trial attorney for failing to object to a single instance of prosecutorial misconduct. Specifically, defendant insists that the prosecutor improperly asserted that defendant

used methamphetamine even though no methamphetamine was found or admitted into evidence at trial. "Generally, [p]rosecutors are accorded great latitude regarding their arguments and conduct." *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). They "are free to argue the evidence and any reasonable inferences arising from the evidence, and need not confine argument to the blandest of all possible terms[.]" *People v Loew*, 340 Mich App 100, 126; 985 NW2d 255 (2022) (quotation marks and citation omitted). But they are not permitted to argue facts not in evidence. *People v Anderson*, 331 Mich App 552, 565; 953 NW2d 451 (2020).

The prosecutor discussed defendant's methamphetamine use during the opening statement. Defendant characterizes that as a fact not in evidence, stating that no physical evidence of drugs was admitted at trial. But three witnesses testified that defendant used methamphetamine. Teall and Conaway testified defendant used methamphetamine four times on the day of the altercation. Defendant's wife, a witness for the defense, said that she knew defendant used methamphetamine. Therefore, the trial record contains abundant evidence that defendant used methamphetamine. The prosecutor did not engage in misconduct by referring during opening statement to defendant's use of methamphetamine, *Loew*, 340 Mich App at 126, so an objection by defense counsel would have been overruled, and we "will not find trial counsel to be ineffective where an objection would have been futile . . . ." *Ogilvie*, 341 Mich App at 34.

## 4. VOUCHING FOR A PROSECUTION WITNESS

Defendant asserts that his trial attorney was ineffective when he vouched for the credibility of Officer Boulter, but defense counsel offered strategic reasons for doing so. "A defendant must meet a heavy burden to overcome the presumption that counsel employed effective trial strategy." *Payne*, 285 Mich App at 190. Defendant cites the following statement by his attorney:

> Because accusations are coming across, some of it I think [Officer Boulter's] not a truth teller. I've known this man for twenty years. I would never say that about him. He tells the truth. I want the jury to understand that. I'd never insinuate that he lied or made anything up at all. I want to make sure everybody knows it. I've known him for a long time. I would never say anything like that about him.

Defense counsel made those statements during the prosecution's redirect examination of Officer Boulter. On direct examination, Officer Boulter testified that he found a box of ammunition in the blue Mercedes-Benz. Then, during cross-examination, Officer Boulter realized his mistake after being prompted by defense counsel, so Officer Boulter corrected his testimony. Later, on redirect examination, the prosecution attempted to rehabilitate Officer Boulter by explaining his mistake. Trial counsel then interrupted to make the statement quoted above.

Defense counsel testified at the *Ginther* hearing that he had strategic reasons for making the challenged statement. First, and most obviously, he wanted the jury to believe Officer Boulter, who had just testified that no ammunition was in the blue Mercedes-Benz. The lack of ammunition supported the defense's theory that there was no gun in the car because it allowed for an inference that defendant never had a gun. Second, defense counsel preferred not to pit the credibility of the defense against the credibility of the police. Instead, defense counsel hoped to convince the jurors that Conaway and Teall were lying. Although unorthodox, the strategy behind defense counsel's decision was sound. Officer Boulter furnished very little testimony detrimental to the defense.

-10-

Defendant did not dispute that there was a fight, that Teall was injured, and that he bled in the car. Officer Boulter's testimony focused on those facts. Officer Boulter made an error by first claiming that there was ammunition in the blue Mercedes-Benz. He then was forced to acknowledge there was no ammunition in the car, which suggested defendant did not have a gun. By sticking up for Officer Boulter, defense counsel was embracing the best evidence in defendant's favor, while also avoiding any suggestion that the police officers were liars. Given the presumption of objectively reasonable trial strategy, defendant's claim of ineffective assistance of counsel on this ground fails. *Payne*, 285 Mich App at 190.

## 5. STIPULATING TO AN ADJOURNMENT OF TRIAL

Defendant blames his attorney for agreeing to adjourn the trial in April 2019. But defense counsel testified that he had a strategic reason for stipulating to the adjournment. Defendant "must meet a heavy burden to overcome the presumption that counsel employed effective trial strategy." *Id*. Before trial was set to begin, the prosecution learned that Teall—who apparently was awaiting trial for unrelated crimes—had cut off his tether and absconded. Defense counsel was told of that event and asked to stipulate to an adjournment of trial. At the hearing where an adjournment was addressed, neither the prosecution nor defense counsel mentioned that Teall was not available for trial. Instead, both sides acknowledged there were ongoing plea negotiations and some cellphone evidence that had to be analyzed. For those reasons, defense counsel agreed to an adjournment.

Defendant claims this was a strategic error because if trial counsel had insisted on going to trial, the prosecution would have been forced to rely on Teall's preliminary examination testimony, rather than live testimony from Teall. Defendant insists that this would have been advantageous for the defense. Also, defendant contends that he specifically told his attorney that he did not agree to an adjournment. Defense counsel testified that he agreed to the adjournment because he thought there was a possibility of reaching a beneficial plea agreement with the prosecution. And because defense counsel believed the prosecution would get an adjournment with or without his agreement, defense counsel saw no reason to jeopardize his relationship with the prosecution and run the risk of upsetting ongoing plea negotiations. Further, defense counsel thought it was prudent to await analysis of the cellular phones.

The trial court agreed with defense counsel on two issues. First, the trial court stated it was likely an adjournment would have been granted without defense counsel's stipulation. Second, the trial court believed defense counsel when he stated there was a potential for a beneficial plea agreement. Thus, the trial court concluded defense counsel's stipulation was a reasonable strategic choice. We review the trial court's factual finding about a potential plea agreement for clear error, *Spaulding*, 332 Mich App at 655-656, and the record contains abundant factual support for the trial court's finding. Defense counsel testified at the *Ginther* hearing that plea negotiations were taking place, and the negotiations were mentioned on the record at the hearing when the adjournment was discussed. Further, defendant and his wife both testified that defense counsel regularly discussed the possibility of a plea agreement. Thus, the trial court's finding was not clearly erroneous.

On the basis of that finding of fact, the trial court concluded it was reasonable trial strategy to agree to the adjournment, rather than oppose it. Defendant believes this was error because the benefit of having Teall's testimony read into the record instead of provided live was worth the risk. But defendant's argument presupposes that the reading of preliminary examination testimony into

the record would have been beneficial to the defense. The record is not so clear. Indeed, if Teall's testimony had been read to the jury, defense counsel would not have had the opportunity to cross-examine Teall in the jury's presence. Because one key piece of evidence in defendant's favor was Teall's written statement that did not mention that defendant showed Teall the gun in defendant's bedroom, cross-examination was particularly important. In sum, defense counsel's choice to agree to an adjournment of trial preserved his relationship with the prosecution (which may have led to a beneficial plea agreement) and afforded time to determine whether exculpatory evidence was on a cellphone. In exchange, defendant gave up the marginally beneficial prospect of having Teall's preliminary examination testimony read into the record. Under the circumstances, defense counsel made a perfectly reasonable choice.

## 6. ADVISING DEFENDANT NOT TO TESTIFY

Defendant contends that his attorney acted ineffectively in advising defendant not to testify at trial. Defense counsel's advice to a client about whether to testify is a matter of trial strategy. *People v Tommolino*, 187 Mich App 14, 17; 466 NW2d 315 (1991). "A defendant must meet a heavy burden to overcome the presumption that counsel employed effective trial strategy." *Payne*, 285 Mich App at 190. By all accounts, defendant's attorney advised defendant not to testify, and defendant followed that advice and waived his right to testify at trial. Defense counsel stated that his decision was strategic because defendant had convictions that would have been brought up on cross-examination. Specifically, defendant had prior convictions for burglary and grand theft of an automobile, and the convictions could have been used for impeachment if defendant had taken the witness stand. Although defendant could have disputed the testimony of Teall and Conaway about the events at issue, he would have subjected himself to cross-examination. Defense counsel made a calculated decision in advising defendant that the risk of cross-examination was not worth the benefit of defendant's testimony. That decision was bolstered by the fact that defendant's wife testified at trial. She was sober, never used drugs, did not have prior convictions, and was inside the car when the fight broke out between defendant and Teall. Furthermore, she testified that she only saw a fistfight and defendant did not have a gun.

In light of defendant's criminal background, the presumption of a valid trial strategy, and the availability of defendant's wife as a better witness, defendant's claim of ineffective assistance of counsel lacks merit. *Payne*, 285 Mich App at 190; *Tommolino*, 187 Mich App at 17. Indeed, in *Tommolino*, this Court ruled that it was valid trial strategy to recommend against testifying even when defense counsel had no other defense. *Id*. Here, where defense counsel had a strong witness and a viable defense strategy that did not require any testimony from defendant, defendant cannot overcome the presumption that defense counsel's advice not to testify was reasonable. *Payne*, 285 Mich App at 190; *Tommolino*, 187 Mich App at 17.

## 7. CUMULATIVE EFFECT OF ERRORS

Defendant complains about the cumulative effect of his attorney's mistakes. Although "the cumulative effect of several errors can constitute sufficient prejudice to warrant reversal where the prejudice of any one error would not[,]" *People v LeBlanc*, 465 Mich 575, 591; 640 NW2d 246 (2002), without proof of any errors, "there can be no cumulative effect of errors meriting reversal." *People v Green*, 313 Mich App 526, 537; 884 NW2d 838 (2015) (quotation marks and citations omitted). In other words, "only actual errors are aggregated to determine their cumulative effect."

*LeBlanc*, 465 Mich at 591 n 12 (citation omitted). Defendant has failed to identify any instances of objectively unreasonable representation by his attorney, so he has no errors to consider in the aggregate. *Green*, 313 Mich App at 537.

## 8. PROCEDURAL ERRORS

Defendant's final claim of error focuses on the judicial officers who handled his case. Both the five-day jury trial and defendant's sentencing hearing were handled by Judge Archie C. Brown in 2019. Judge Brown retired after that, so his criminal cases were temporarily reassigned to Judge Patrick J. Conlin, who conducted the three-day *Ginther* hearing in 2022. After the *Ginther* hearing ended, Judge Arianne E. Slay was appointed as Judge Brown's successor. She took over all Judge Brown's criminal cases, including defendant's case, even though it was already pending on appeal. Judge Slay explained in her written opinion issued on August 1, 2023, denying defendant's motion for a new trial that she "ha[d] reviewed the original jury trial transcripts in addition to the Ginther hearing transcripts." Based upon her review of the entire record, Judge Slay decided defendant's posttrial motion even though she had not presided at defendant's trial or his *Ginther* hearing.

Defendant characterizes the *Ginther* proceeding as "fraught with its' [sic] own due process violations as two separate judges heard testimony and neither was the presiding trial judge." That characterization is incorrect; only Judge Conlin presided at the *Ginther* hearing. But, beyond that, defendant has furnished no explanation whatsoever of the claimed due-process violation, nor has defendant provided any legal authority for that claim of error, which is simply made in passing as part of the "conclusion" section of defendant's brief. Therefore, we deem that claim abandoned. See *People v Martin*, 271 Mich App 280, 315; 721 NW2d 815 (2006). An appellant cannot simply assert an error and then leave it up to this Court to discover and rationalize the basis for his claim. *Id*. Instead, we simply conclude by observing that defendant has provided no basis for a new trial, so his convictions and sentences must stand.

Affirmed.

/s/ Brock A. Swartzle
/s/ James Robert Redford
/s/ Christopher P. Yates